IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SUSAN BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19CV273 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Susan Bennett ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.   PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on June 19, 2015, alleging a disability onset date of October 15, 2014. (Tr. at 12, 181-87.)[1] Her claim was denied initially (Tr. at 64-77, 92-95), and that determination was upheld on reconsideration (Tr. at 78-91, 102-09). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 110-11.) Plaintiff attended the subsequent hearing on March 27,

---

[1] Transcript citations refer to the Administrative Record [Doc. #8].

2018, along with her attorney and an impartial vocational expert. (Tr. at 12, 33.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 21), and, on January 17, 2019, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-5).

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)).

> Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment;

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

(3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy.

Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" between her alleged onset date, October 15, 2014, and her date last insured, June 30, 2018. Plaintiff therefore met her burden at step one of the sequential evaluation process. (Tr. at 14.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> history of deep vein thrombosis (DVT), history of shunted pseudotumor cerebri, and obesity[.]

(Tr. at 14.) The ALJ next found at step three that none of Plaintiff's impairments, individually or in combination, met or equaled a disability listing. (Tr. at 15.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, through her date last insured, Plaintiff had the RFC to perform light work with the following, additional limitations:

> [Plaintiff] can never climb ladders, ropes or scaffolds; cannot have concentrated exposure to temperature[] extremes or hazards, such as heights or moving machinery, and would not be capable of commercial driving. [Plaintiff] would be limited to simple, repetitive, and routine tasks with occasional decision-making and occasional changes to the work duties and would have the ability to maintain concentration up to 2 hours at a time.

5

(Tr. at 15.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff was unable to perform any of her past relevant work. (Tr. at 19-20.) However, at step five, the ALJ found that, given Plaintiff's age, education, work experience, and RFC, she could perform other jobs available in the national economy. (Tr. at 20-21.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 21.)

Plaintiff now contends that, in formulating her RFC, the ALJ failed to adequately account "for the vocationally limiting effects of Plaintiff's well documented chronic headaches." (Pl.'s Br. [Doc. #12] at 1.) After a thorough review of the record, the Court agrees that substantial evidence fails to support the ALJ's decision.

When assessing Plaintiff's RFC, the ALJ found that Plaintiff's "intractable headaches and severe memory impairment would limit her to no more than simple, repetitive, and routine tasks with [the] ability to maintain concentration for no more than 2 hours at a time." (Tr. at 17.) She further found that Plaintiff's "allegations of disabling pain and other limitations [were] not fully supported by the objective medical evidence and other relevant evidence" (Tr. at 17), explaining that "[d]espite the severity of the invasive procedures and extensive symptoms reported by [Plaintiff] throughout the record, there is evidence in the record to temper the severity and chronicity of the symptoms as alleged" (Tr. at 19).

In discounting the severity and limiting effects of Plaintiff's headaches, the ALJ relied on the following analysis:

> [T]here is no medical evidence of record that goes back as far as the alleged onset date. The undersigned also has taken into account the discrepancy of the reported 7-8 emergency room visits per year for intractable headaches, as alleged, and the failure of the representative to provide documentation of same,

6

despite ample opportunity, as detailed in the procedural history above. When
questioned why there had been no neurological treatment since 2016, [Plaintiff]
testified that she goes to the emergency room 7-8 times a year for headaches
that last more than two hours. Only one visit was submitted, in September
2017. The record contains emergency room visits for things other than
[Plaintiff's] alleged impairments. [Plaintiff's] representative was also given
post[-]hearing time to make arguments and submit a brief. No brief was
submitted.

The medical evidence of record reflects [that Plaintiff] stopped neurological
treatment, even though she had insurance. Allegations of emergency room
visits for headaches lasting more than two hours have not been submitted even
though additional time was given. This implies [Plaintiff] exaggerated this. She
also testified she could lift 20 pounds. She alleges vertigo, but takes no
medication for same. [Plaintiff] takes no medication for migraines. She testified
that they did not help, but treatment notes in Exhibit 15F say Imitrex helped.
There is no medical evidence of right shoulder pain.

(Tr. at 19.) Thus, the ALJ relied on the following findings to "temper the severity and chronicity of the symptoms as alleged":

1. "[T]here is no medical evidence of record that goes back as far as the alleged onset date" of October 15, 2014.

2. Plaintiff "testified that she goes to the emergency room 7-8 times a year for headaches that last more than 2 hours" but "[o]nly one visit was submitted, in September 2017," and "[a]llegations of emergency room visits for headaches lasting more than two hours have not been submitted even though additional time was given. This implies the claimant exaggerated this." The ALJ further noted that she had "taken into account the discrepancy of the reported 7-8 emergency room visits per year for intractable headaches, as alleged, and the failure of the representative to provide documentation of same."

3. Plaintiff "stopped neurological treatment, even though she had insurance" and there had been "no neurological treatment since 2016."

4. "She alleges vertigo, but takes no medication for same."

5. She "takes no medication for migraines. She testified that they did not help, but treatment notes in Exhibit 15F say Imitrex helped."

6. "There is no medical evidence of right shoulder pain."

7

(Tr. at 19.) However, a review of the record reveals that each of these bases for discrediting Plaintiff's allegations is without basis or support.

First, with respect to the finding that "[t]here is no medical evidence of record that goes back as far as the alleged onset date" of October 15, 2014, Plaintiff's medical records do go back as far as her alleged onset date, as evidenced in Exhibit 3F, which contains Plaintiff's records from her primary care provider, Oakboro Medical Services, between May 3, 2011 and May 11, 2015. (Tr. at 397-457.) Those records specifically include a visit on June 24, 2014, approximately four months prior to the alleged onset date, for vertigo. (Tr. at 421-23.) This is consistent with Plaintiff's testimony that she began to experience vertigo and continued to try to work, but ultimately could not safely drive and stopped working in October 2014 (Tr. at 41). At the visit in June 2014, Plaintiff was treated with Antivert (meclizine), Phenergan and Solu Medrol, and medical records through the alleged onset date and to the end of 2014 continue to list meclizine as a current medication (Tr. at 421-23, 417-20, 450.) She continued to seek treatment and was subsequently diagnosed a month later in January 2015 with swelling of the optic disc (Tr. at 465-66), she had an MRI and lumbar puncture in February 2015 (Tr. at 392, 394), she was referred to a neurosurgeon in June 2015 (Tr. at 460), the neurosurgeon (Dr. McLanahan) noted that she reported significant headaches that began in October 2014, he diagnosed pseudotumor cerebri (intracranial hypertension) and performed brain surgery to place a shunt in July 2015 (Tr. at 472-76), she had complications from the surgery, and she underwent a shunt revision surgery in September 2015 (Tr. at 552-53).

Second, the ALJ erroneously states that only one emergency room visit for a headache appeared in the record. In fact, the record reveals numerous ER visits for headaches, including

8

March 2016 (Tr. at 1027-29) August 2016 (Tr. at 980-82), February 2017 (Tr. at 1011), March 2017 (Tr. at 1120), September 2017 (Tr. at 2058), and February 2018 (Tr. at 1893). The treatment notes confirm that "these ER visits occurred when [Plaintiff's] headaches lasted for longer than two days and thus were not relieved by the usual taking of additional medication and lying down in a dark room until they subsided," consistent with [Plaintiff's] testimony. (Pl.'s Br. at 7; Tr. at 1011, 1120, 2058.) Moreover, during the hearing, Plaintiff initially testified that she went to the emergency room seven or eight times a year in the following exchange:

> Q. Okay. So you indicated if you have a headache more than two days you'll go to the emergency room. Is that right?
> A. Yes, ma'am.
> Q. So I have emergency room visit in February '18.
> A. Yes, ma'am.
> Q. How many times a year would you say that happens, that you have to go to the emergency room –
> A. Probably –
> Q. Because of a headache?
> A. Seven or eight.
> Q. Seven or eight times a year?
> A. Probably.

(Tr. at 46-47.) Later in the hearing, the ALJ noted that she did not see documentation of emergency room visits seven to eight times a year. Plaintiff's representative noted that the documentation included visits for "pain in the chest and the shoulder," and "[t]here's more of those than the emergency room visits for the headaches." (Tr. at 54.) The ALJ then clarified with Plaintiff as follows:

> Q. So how do you explain the discrepancy? Are you sure you go to the emergency room seven or eight times a year for your headaches?
> A. I may have put the other visits in with it.

(Tr. at 54.) The ALJ then noted that she only had documentation for one or two emergency room visits over a two or three year period, and Plaintiff noted that "[t]hat doesn't sound

9

correct. There has to be something missing." (Tr. at 55-56.) As noted above, the record reflects six emergency room visits for headaches over a two-year period, not one or two over a two- or three-year period as asserted by the ALJ. Moreover, to the extent Plaintiff "put the other visits in with it," as Plaintiff clarified in her testimony, the evidence reflects that for the one year period prior to the hearing, from March 2017 to February 2018, Plaintiff visited the emergency room 7 times, and 3 of those visits were for intractable headache. (Tr. at 1120-24, 1134-40, 1146, 1163-64, 2058, 1785, 1893.) In the year prior to that, from March 2016 to February 2017, Plaintiff visited the emergency room 8 times, and 3 of those visits were for intractable headache. (Tr. at 1027-29, 985, 1038, 1068, 1076-80, 980, 990-1001, 1011-16.) Thus, in the two years prior to the hearing, she visited the emergency room 7 to 8 times per year, as alleged, and at least 6 of those visits were specifically for headaches that would not respond to medication and treatment at home.[4]

Third, with respect to the ALJ's finding that Plaintiff "stopped neurological treatment, even though she had insurance" and that there had been "no neurological treatment since 2016," the record reflects that Plaintiff did not stop neurological treatment in 2016 as the ALJ suggests. During 2016 and 2017, Plaintiff saw a neurologist (Dr. Liu), a neuro-ophthalmologist (Dr. Brown), and a neurosurgeon (Dr. McLanahan), all with respect to her

---

[4] Notably, the ALJ does not discuss or summarize this evidence and cites only to the emergency room visit in September 2017. The ALJ does generally note that "[t]he record contains emergency room visits for things other than [Plaintiff's] alleged impairments." (Tr. at 19.) However, many of these visits relate to Plaintiff's pulmonary embolism in September 2016, and subsequent diagnosis of Lupus Coagulent Disorder with lifetime anticoagulant treatment and monitoring. Although the ALJ noted the "history of [DVT]" as a severe impairment, the ALJ did not address the emergency room visits in 2016 and 2017 related to the pulmonary embolism and the subsequent visits for chest pain or leg pain to address the possibility of another DVT. (Tr. at 1038, 1044, 1076-80, 990-1001, 1110-15, 1134-40, 1146-48, 1785-86, 1180-82, 1242-43, 1295, 1312-13, 1344, 1374).

10

pseudotumor cerebri. Plaintiff's last visit with Dr. Liu was October 2016 (Tr. at 746-69), and Plaintiff testified at the hearing that she had recently made another appointment but Dr. Liu had a six-month waiting list for appointments. (Tr. at 42.)[5] Dr. Liu continued to prescribe medication for her during the wait time between appointments (Tr. at 43.) Moreover, during the time period between her last appointment with Dr. Liu in October 2016 and the hearing in March 2018, Plaintiff had four appointments with her neurosurgeon Dr. McLanahan or his staff in November 2016 (Tr. at 667-71), March 2017 (Tr. at 666), May 2017 (Tr. at 663-65), and September 2017 (Tr. at 1763-66). Dr. McLanahan noted the possibility for further surgery including a lumbar catheter, and noted her symptoms of headaches 2-3 times per week and chronic vertigo. (Tr. at 663-64, 666, 667.) During that same time period between October 2016 and the hearing in March 2018, Plaintiff also saw her neuro-ophthalmologist Dr. Brown twice, in November 2016 and May 2017 (Tr. 52, 696-99, 703-04).[6] Thus, the record does not support the ALJ's finding that she "had no neurological treatment since 2016" or that she "stopped neurological treatment, even though she had insurance."

Fourth, with respect to the ALJ's finding that she "alleges vertigo, but takes no medication for same," the record includes numerous visits noting vertigo or dizziness (Tr. at 421, 1672, 774, 807, 980, 667-71, 927, 703-04, 1763, 1791), and Plaintiff was initially treated with meclizine and corticosteroids (Tr. at 421-23, 1760). The medical records continue to note treatment with antihistimines and corticosteroids, and a recurring entry for medication for

---

[5] The notes of Plaintiff's primary care provider confirm the long wait time for an appointment with Dr. Liu when originally referred in 2015. (Tr. at 1676.)

[6] Plaintiff also had appointments with her primary care provider (Dr. Lamichhane), and had appointments at the Pain Clinic where she reported dizziness, headaches, and post-surgical neuropathic pain (Tr. at 838-40, 882, 886-87, 921, 925).

11

motion sickness relief as needed (Tr. at 450, 417-20, 748, 858, 905, 947, 994, 1012, 1121, 1269, 1345-46, 1399, 1415, 1433, 1445, 1460, 1469, 1496, 1520, 1570, 1584, 1593, 1865, 1900, 1970, 1982, 1996). This is consistent with Plaintiff's testimony:

> Q. Are you taking medication for [vertigo]?
> A. Not right now. That's one of the meds that you take as you need it.
> Q. Okay. So when you feel dizzy, do you take it?
> A. Yes, ma'am.
> Q. And does it resolve?
> A. Not always.

(Tr. at 48.).

Fifth, with respect to the ALJ's finding that Plaintiff "takes no medication for migraines" and that "[s]he testified that they did not help, but treatment notes in Exhibit 15F say Imitrex helped," there is no evidence that Plaintiff took the illogical step of stopping her treatment with Imitrex despite its efficacy in alleviating her headaches. The ALJ cites to Exhibit 15F, which is the treatment record for Dr. Liu. That record reflects that at her first visit with Dr. Liu, Plaintiff reported that with respect to medications tried in the past, "Imitrex helped." (Tr. at 724.) Dr. Liu therefore prescribed Imitrex, noting that, "[f]or her headac[he]s, will let her try Imitrex 100 mg prn to see if it would help." (Tr. at 728.) However, the next visit with Dr. Liu reflects that Plaintiff continued to have headaches, and Dr. Liu noted that, "I tried the patient with Imitrex without benefit." (Tr. at 747.) Dr. Liu therefore switched Plaintiff to try Relpax, but Plaintiff testified that it also did not help. (Tr. at 750, 56.) Other records reflect that Plaintiff continued to take propranolol as a preventative medication for migraines, although she still had frequent headaches despite medication. (Tr. 208, 235, 268, 405, 417, 512, 635, 667-70, 671, 675, 1181, 1672, 1657-58, 1574-75, 1436-37, 1763-64, 1027-29, 980, 1011-16, 1120-24, 1893.)

12

Sixth, the ALJ found that there was "no medical evidence of right shoulder pain," but earlier in the opinion the ALJ summarized her "neuropathic pain in the right shoulder in the upper pectoralis/right clavicular joint, which developed postoperatively after ventricular atrial shunt placement." (Tr. at 17.) In that earlier discussion, the ALJ cited to medical records reflecting ongoing treatment for the shoulder pain, which appears to have been the result of damage to a nerve during the shunt revision surgery. The records reflect that Plaintiff was prescribed gabapentin and was seen regularly at the Pain Clinic, where she was assessed with Right Brachial Plexus Nerve Pain as a "post-operative pain." (Tr. at 642, 649, 652, 661-62.) She continued on gabapentin for her shoulder pain, and it is not clear why the ALJ then concluded that there was no medical evidence of right shoulder pain.

In light of the lack of evidence to support any of these findings, the Court cannot conclude that the ALJ's decision is supported by substantial evidence. While it may be that the RFC in this case could adequately account for Plaintiff's limitations, the reasons cited by the ALJ are not supported by the record, and the Court cannot now substitute other reasons or analysis not relied upon by the ALJ. See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) (holding that courts must review administrative decisions on the grounds upon which the record discloses the action was based); Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726, at *1 (M.D.N.C. Mar. 25, 2014) (noting that this Court's "[r]eview of the ALJ's ruling is limited further by the so-called 'Chenery Doctrine,' which prohibits courts from considering post hoc rationalizations in defense of administrative agency decisions. Under the doctrine, a reviewing court must judge the propriety of [agency] action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the

13

administrative action by substituting what it considers to be a more adequate or proper basis." (quotations and citations omitted)).[7]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for further consideration of Plaintiff's claim in light of the above recommendation. Defendant's Motion for Judgment on the Pleadings [Doc. #13] should be DENIED, and Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #11]

---

[7] The Court also notes that the ALJ relied on Plaintiff's activities, particularly her cake-baking business, in discounting the severity of her impairments, particularly her headaches. Specifically, the ALJ wrote as follows:

> [Plaintiff's] activities of daily living are significant and independent. [Plaintiff] has a home business baking cakes and selling them out of her home. She is paid $25 per cake. She said she did not have a lot of orders, but rather sold the cakes by word of mouth. She said she did this for seven months. She said she made about 10 cakes. [Plaintiff] also alleges memory issues due to shunt placement. However, there are no objective findings to support this and [Plaintiff's] ability to run a cake baking business out of her home casts doubt on these claims. At any rate, the RFC accounts for any memory impairment.

(Tr. at 19.) In other words, the ALJ used Plaintiff's testimony that she could bake ten cakes over a period of seven months, an average of one cake every 21 days, as evidence that Plaintiff's headaches would not limit her ability to work a full-time job. However, as the Fourth Circuit explained in Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018), "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." See also Lewis v. Berryhill, 858 F.3d 858, 868 n.3 (4th Cir. 2017) ("The ALJ points to Lewis' ability to perform incremental activities interrupted by periods of rest, such as 'driv[ing] short distances of up to 30 miles, shop for groceries with the assistance of her mother or roommate, handle her finances, and watch television.' The ALJ's conclusion that Lewis' activities demonstrate she is capable of work is unsupported by the record.") (citation omitted); Brown v. Comm'r, 873 F.3d 251, 263 (4th Cir. 2017); Fletcher v. Colvin, No. 1:14CV380, 2015 WL 4506699 at *5-8 (M.D.N.C. Jul. 23, 2015). In this regard, Plaintiff contends that, "the ALJ's citation to activities in which [Plaintiff] engages when she is not experiencing a headache . . . has little relevance to her ability to work on a consistent basis, eight hours per day, five days per week during which she will have periods of time when a debilitating headache is occurring." (Pl.'s Br. at 9.) Given the necessity of a remand in light of the lack of substantial evidence supporting the ALJ's reasoning as set out above, the Court need not consider this issue further, and further consideration of this issue will be before the ALJ on remand.

14

should be GRANTED to the extent set out herein. However, to the extent Plaintiff seeks an immediate award of benefits, her Motion is DENIED.

This, the 8th day of September, 2020.

/s/ Joi Elizabeth Peake
United States Magistrate Judge